Judgment rendered June 24, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,888-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JIMMY WASHINGTON AND                    Plaintiffs-Appellants
DAPHNE WASHINGTON

versus

AMERICAN NATIONAL                       Defendants-Appellees
GENERAL INSURANCE
COMPANY, COLLINS NATURAL
HORSEMANSHIP, LLC, DAVID
GLENN COLLINS, AND ANNA
GEORGE

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 62,674

Honorable Thomas Wynn Rogers, Judge

* * * * *

PATRICK R. JACKSON, APLC               Counsel for Appellants
By: Patrick Richmond Jackson

DAVENPORT, FILES & KELLY, LLP          Counsel for Appellees
By: Martin Shane Craighead

* * * * *

Before THOMPSON, ROBINSON, and MARCOTTE, JJ.

**ROBINSON, J.**

Daphne Washington suffered significant injuries when she fell from a horse during a supervised trail ride. Daphne and her husband, Jimmy Washington, appeal a judgment granting the defendants' motion for summary judgment and dismissing their lawsuit. For the following reasons, we reverse the judgment and remand this matter to the trial court for further proceedings.

**FACTS**

On April 8, 2022, Daphne and Jimmy were riding horses at Camp Collins in Lincoln Parish when Daphne fell from her horse, Magnum. David Collins ("Collins") and Anna George owned Camp Collins and the horses ridden by the Washingtons.

On October 31, 2022, the Washingtons filed suit against Collins Natural Horsemanship, Collins, George, and American National General Insurance Company. They alleged that Magnum stepped into a large hole and threw Daphne to the ground. They also alleged that Collins told them that the area that he had taken them riding through was infested by earth-burrowing animals which had created subsurface and hidden holes. They further alleged that Collins should not have taken them riding through that area because of the unreasonable risk of harm it presented. The Washingtons maintained that the accident was caused by: (1) the failure to properly maintain the grounds to keep them free from hazardous conditions; (2) the failure to properly inspect and maintain the grounds in a manner sufficient to avoid deterioration and hazardous conditions; (3) the failure to

warn them of a known hazardous condition; (4) the violation of the duty of landowners to prevent unreasonable risk of injuries to those using the grounds; and (5) the violation of Louisiana laws.

Collins, George, and their insurer, ANPAC Louisiana Insurance Company, answered the petition. They stated that Collins had ceased doing business through Collins Natural Horsemanship several years before the accident.[1] They denied that Magnum stepped into a large hole. The defendants pled the provisions of La. R.S. 9:2795.3 and asserted that the warning notice required by the statute had been posted.

La. R.S. 9:2795.3 ("statute") provides a limitation on liability for sponsors of equine activities. It states in relevant parts:

> B. Except as provided in Subsection C of this Section, an equine activity sponsor, an equine professional, or any other person, which shall include a corporation or partnership, shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities and, except as provided in Subsection C of this Section, no participant or participant's representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional, or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities.
>
> C. Nothing in Subsection B of this Section shall prevent or limit the liability of an equine activity sponsor, an equine professional, or any other person if the equine activity sponsor, equine professional, or person either:
> . . .
> (2) Failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity and to safely manage the particular equine based on the participant's representations of his ability.
> (3) Owned, leased, rented, or otherwise was in lawful possession and control of the land or facility upon which the participant sustained injuries because of a dangerous latent condition which was known or should have been known to the

---

[1] The Washingtons dismissed their claims against Collins Natural Horsemanship as well against American National General Insurance Company.

2

equine activity sponsor, equine professional, or person and for which warning signs have not been conspicuously posted.
(4) Committed an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury.
. . .

E. Every equine professional and every equine activity sponsor shall post and maintain signs which contain the warning notice specified in Subsection F of this Section. Such signs shall be placed in a clearly visible location on or near any stable, corral, or arena where the equine professional or the equine activity sponsor conducts equine activities. The warning notice specified in Subsection F of this Section shall appear on each sign in black letters, with each letter to be a minimum of one inch in height. Every written contract entered into by an equine professional or by an equine activity sponsor for the providing of professional services, instruction, or the rental of equipment or tack or an equine to a participant, whether or not the contract involves equine activities on or off the location or site of the equine professional's or the equine activity sponsor's business, shall contain in clearly readable print the warning notice specified in Subsection F of this Section.

F. The signs and contracts described in Subsection E of this Section shall contain the following warning notice:

WARNING

Under Louisiana law, an equine activity sponsor or equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to R.S. 9:2795.3.

G. Failure to comply with the requirements concerning warning notices provided in this Section shall prevent an equine activity sponsor or equine professional from invoking the privilege of immunity provided by this Section.

On April 9, 2025, the defendants filed a motion for summary judgment. They argued that Daphne was injured when she fell from Magnum after he stubbed his hoof, stumbled, and dropped to his knee, which is a normal and inherent risk of horseback riding. They maintained that Magnum did not step into a preexisting hole, and the accident occurred in an open pasture on a gently sloped decline and was at least 150 yards

away from the nearest known hole or molehill. They asserted that the Washingtons were provided with well-trained horses and were given proper riding instructions. They argued that the Washingtons had produced no evidence to support their allegations that Collins and George failed to properly maintain their grounds, allowed hazardous conditions to exist, violated the duties of landowners, or violated Louisiana statutes. Finally, the defendants contended that they were immune from liability under the statute. In support of their motion, the defendants submitted the petition, excerpts from Daphne's deposition, excerpts from Jimmy's deposition, excerpts from Collins's deposition, and Collins's affidavit.

The Washingtons argued in opposition to the motion for summary judgment that no signs warning them of dangers from holes or hills caused by moles were posted even though the grounds were known to be infested by moles. They further argued that Collins did not train Daphne on the need to be alert for obstacles and what to do if her horse stumbled. The Washingtons contended that genuine issues of material fact remained as to three of the five exceptions found in the statute. The genuine issues of material fact concerned: (1) Collins's failure to make reasonable and prudent efforts to determine Daphne's ability to safely ride the horse; (2) the existence of a dangerous latent condition, the molehills, which was known or should have been known to Collins, and that he failed to have warning signs conspicuously posted; (3) Collins's act or omission, which constituted willful or wanton disregard for their safety, through his failure to properly assess their riding experience, failure to provide proper training and instruction on riding, and failure to warn of the danger of molehills on the

4

property; and (4) the nature of the latent condition which caused the accident.

Submitted in opposition to the motion for summary judgment were excerpts from Collins's deposition, excerpts from Daphne's deposition, and excerpts from Jimmy's deposition.

Daphne testified at her deposition that she had not ridden a horse since high school. When they arrived at Camp Collins, Collins was a little upset with them because they were late and he said that time is money. George had them sign waivers.

According to Daphne, they were given a very brief introduction in a pavilion area on how to guide their horses with the reins. They then rode around for a little bit before starting on the trail. Magnum ventured off the trail and started up a hill. She alerted Collins, who told her to guide Magnum back down. She was guiding Magnum downhill when she fell. Daphne testified that while they were on the trail, she saw molehills and holes. She asked Collins what he did to get rid of the moles since the Washingtons had moles on their property. She recalled discussing moles with Collins, but she could not remember what he said. Daphne did not know if there were any molehills in the area where she fell.

Jimmy testified at his deposition that he had never been on a horse before the trail ride. He recalled that they were running late, and the first thing that Collins said to them when they arrived was that time is money. Collins briefly told them how to pull the reins to steer and stop the horse.

Jimmy saw mole holes and asked Collins about them because he had mole holes in his own yard. He asked Collins what he did for the moles, but Collins never said how he treated them.

Jimmy testified that he did not inspect the area after the accident as he was tending to Daphne. He was unable to say whether Magnum stumbled in a hole or a molehill. A few days after Daphne fell, Jimmy returned to obtain a copy of the release. Jimmy claimed that Collins told him then that the best he could figure out was that Magnum stepped into a hole.

Collins testified at his deposition that he had been leading trail rides since 1998. He asks trail riders about their level of experience, and always assumes they overestimate their riding skills. Jimmy had never ridden a horse before, and Daphne had ridden horses when she was a child. Collins provided the Washingtons with two retired mounted patrol horses that he referred to as "babysitters," which are used for beginners.

Collins testified that it takes him three to five minutes to go over everything with the riders. He tells them to keep their heels down, and he shows them how to get a shorter grip on the reins, how to steer the horse, how to make the horse stop and go, and what to do in an emergency. He then walks them around his arena once or twice to ensure the riders are comfortable with their horses. He asked the Washingtons if they wanted to stay in the arena or go on the trail, and they said they wanted to go on the trail. He did not recall telling the Washingtons that time is money when they arrived late. There were no time constraints.

They rode in a line, with Collins leading, Jimmy in the middle, and Daphne last. Daphne had gotten 40-50 feet behind them because Magnum

was a slower horse, so Collins stopped his horse and turned it sideways. Although Magnum had momentarily gone off to the side, he was still on the trail and had gotten right back in line where Collins wanted him to be. Collins saw Magnum stub his hoof, go down to his knee, and then stand right back up without moving. Collins dismounted, helped Jimmy off his horse, then told him to hold the horses while he checked on Daphne.

Collins pointed out the molehills to the Washingtons as they rode so they could avoid them. He would fill holes when he found them because a horse can stumble in a hole, but had not done anything about the moles. He did not recall Jimmy asking him about how he handled the moles.

Collins estimated that the distance from where the accident occurred to the nearest molehill was 150-200 yards. He denied that there was a hole; rather, Magnum made an indentation with his hoof. Collins also denied telling Jimmy a few days later that he thought Magnum had stepped in a hole.

Collins took a photo on April 11 of where Daphne had fallen. A photo purported to be of the hole made by Magnum was attached to Collins's deposition. Collins estimated that Magnum's hoof may have gone into the dirt around three inches. It was a gentle slope where she had fallen, and he had taken them on an easy part of the trail.

Collins testified that Magnum has a perfect safety record and he still considers Magnum to be a "babysitter." Since the accident, they have tried to keep riders in their arena as they are somewhat "gun shy" about doing trail rides. When asked if he saw any other reason why Magnum tripped at

that location, Collins replied that maybe it was because Daphne's weight was too far forward, but that was just an assumption.

Collins testified in his affidavit that an equine warning sign was clearly visible to all visitors and was posted on the boarder's tack room at the stable. A photo of the sign was attached to his affidavit.

The trial court rendered its ruling on August 26, 2025. The court determined that the facts alleged in the petition could only provide the Washingtons with a cause of action under the third exception to the statute: "Owned, leased, rented, or otherwise was in lawful possession and control of the land or facility upon which the participant sustained injuries because of a dangerous latent condition which was known or should have been known to the equine activity sponsor, equine professional, or person and for which warning signs have not been conspicuously posted."

The court noted that in their opposition to the motion for summary judgment, the Washingtons asserted there were genuine issues of material facts surrounding: (1) Collins's failure to make reasonable and prudent efforts to determine Daphne's ability to safely ride the horse, and (2) his willful or wanton disregard for Daphne's safety by failing to properly assesses her experience, failing to provide proper training and instruction on riding, and failing to warn of the danger of molehills on the property. However, the court recognized that the petition did not allege any facts to substantiate those two claims. The court added that the Washingtons had not amended their pleadings.

The court then considered whether the Washingtons had expanded their pleadings through their memorandum in opposition to the motion. The

defendants had not objected to the newly raised issues. The court ultimately concluded that it would not consider the alleged issues of material fact raised for the first time in the Washingtons' opposition.

The court noted that the remaining issue was what caused Magnum to stumble. Collins testified that he saw the horse stumble. When he returned to the site later in the week, he found no large hole but only an imprint from where Magnum had stubbed his hoof. Collins took a photo of the imprint. While the court recognized that Jimmy claimed that Collins had told him that the best he could figure out was that Magnum stepped into a hole, which Collins denied saying, the court believed that the alleged statement was not material since Collins verified there was no hole when he returned to the scene and photographed the imprint. Therefore, the court found there were no genuine issues of material fact and the defendants were entitled to summary judgment as a matter of law because none of the statute's exceptions applied. The motion for summary judgment was granted, and the Washingtons' claims against Collins, George, and ANPAC were dismissed with prejudice.

On September 3, 2025, the Washingtons filed a motion for leave to amend their petition to add the two additional claims noted by the trial court. The Washingtons also filed a motion for new trial on that same date. The trial court denied both motions.

The Washingtons have appealed the judgment granting the summary judgment.

**DISCUSSION**

The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969; the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).

While the burden of proof rests with the mover, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. La. C.C.P. art. 966(D)(1). The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. *Id.*

A summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So. 2d 880.

10

Statutes that grant immunities or advantages to special classes in derogation of the general rights available to tort victims must be strictly construed against the party claiming the immunity or advantage. *Foshee v. Louisiana Farm Bureau Cas. Ins. Co.*, 41,842 (La. App. 2 Cir. 1/31/07), 948 So. 2d 1171, *writ denied*, 07-0483 (La. 4/20/07), 954 So. 2d 169.

The Washingtons argue on appeal that facts were alleged supporting the third and fourth exceptions. They further argue that while the trial court acknowledged there are factual discrepancies concerning what Magnum stepped in, the court then impermissibly resolved those discrepancies by weighing evidence.

The defendants argue that the Washingtons failed to produce factual support to establish that any exception to the statute applies. There was no evidence that Magnum stepped into an already-existing hole. The defendants further argue that the trial court did not weigh evidence, but applied summary judgment principles to undisputed evidence showing that Daphne fell because Magnum stumbled, which was an inherent risk of equine activity that falls under the statute.

Turning our attention to the third exception, we conclude that there is a genuine issue of material fact regarding whether Daphne sustained her injuries because of a dangerous latent condition which was known or should have been known to Collins and George and for which warning signs have not been conspicuously posted. Although Collins disputed it, Jimmy claimed that Collins told him several days after the accident that the best he could figure out was that Magnum stepped into a hole. Collins believed he

documented where Magnum stumbled with a photograph taken several days after the accident.  While Collins claims the nearest molehill was 150-200 yards away, there were holes created by moles at least some point along the trail.  It will be up to the factfinder to assess credibility and weigh the probative value of the photograph to determine whether there was a dangerous latent condition, *i.e.*, a molehill or hole which caused Magnum to stumble.  Accordingly, the motion for summary judgment was improperly granted.

## CONCLUSION

For the foregoing reasons and at appellees' costs, the judgment is reversed and the matter remanded to the district court for further proceedings.